WO            IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


ERIC MAURICE CANNON, JR.,            )
                                     )
                        Plaintiff,   )
                                     )
        vs.                          )
                                     )
COMMISSIONER OF SOCIAL SECURITY,     )
                                     )        No. 3:18-cv-0127-HRH
                        Defendant.   )
_____)



O R D E R

        This is an action for judicial review of the denial of disability benefits under Title II

and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1383f.  Plaintiff Eric

Maurice Cannon has timely filed his opening brief,[1] to which defendant, the Commissioner

of the Social Security, has timely responded.[2]  Oral argument was not requested and is not

deemed necessary.

Procedural Background

        On July 24, 2014, plaintiff filed applications for disability benefits under Title II and

Title XVI of the Social Security Act.  Plaintiff alleged that he became disabled due to a

_____

        [1]Docket No. 17.

        [2]Docket No. 19.

learning disability, head trauma, and migraine headaches.  Plaintiff alleged that he became disabled on November 28, 2013.  Plaintiff's applications were denied.  Plaintiff requested a hearing.  After an administrative hearing on August 4, 2016, an administrative law judge (ALJ) denied plaintiff's claims.  Plaintiff sought review of the ALJ's unfavorable decision.  On March 29, 2018, the Appeals Council denied plaintiff's request for review of the ALJ's decision, thereby making the ALJ's December 12, 2016 decision the final decision of the Commissioner.

On May 30, 2018, plaintiff commenced this action in which he asks the court to review the final decision of the Commissioner.

## General Factual Background

Plaintiff was born on February 11, 1991.  Plaintiff was 25 years old at the time of the administrative hearing.  Plaintiff has a high school education.  Plaintiff had an IEP throughout his schooling and "qualifie[d] for special education services as learning disabled in the areas of Math, Reading, and Written Expression."[3]  Plaintiff's past relevant work includes work as an asbestos remover, roustabout, and event setup worker.

## The ALJ's Decision

The ALJ first determined that plaintiff "meets the insured status requirements of the Social Security Act through June 30, 2014."[4]

---

[3]Admin. Rec. at 487.

[4]Admin. Rec. at 20.

The ALJ then applied the five-step sequential analysis used to determine whether an individual is disabled.[5]

At step one, the ALJ first found that plaintiff had "engaged in substantial gainful activity during the following period: November and December 2014. . . ."[6] However, the ALJ also found that "there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period(s)

---

[5]The five steps are as follows:

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled. If not, proceed to step two.
> Step two:  Is the claimant's alleged impairment sufficiently severe to limit . . . h[is] ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1?  If so, the claimant is disabled.  If not, proceed to step four.
> Step four:  Does the claimant possess the residual functional capacity ("RFC") to perform . . . h[is] past relevant work? If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow . . . h[im] to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

[6]Admin. Rec. at 20.

during which the claimant did not engage in substantial gainful activity."[7]

At step two, the ALJ found that plaintiff had "the following severe impairments: history of closed head[] injuries, seizures, migraine headaches, and cognitive disorder. . . ."[8] The ALJ found that any functional limitations related to plaintiff's diagnoses of intellectual disability/borderline intellectual functioning and learning disorder were "adequately accounted for by consideration of the claimant's cognitive disorder as a severe impairment."[9] The ALJ found plaintiff's diagnoses of attention-deficit/hyperactivity and depressive disorder non-severe.[10]

At step three, the ALJ found that plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. . . ."[11] The ALJ considered Listings 11.18 (cerebral trauma/traumatic brain injury) and 12.02 (neurocognitive disorder). The ALJ considered the "paragraph B" criteria and found that plaintiff had mild restrictions in activities of daily living; mild difficulties with social functioning; moderate to marked difficulties with regard to concentration, persistence, or pace; and no episodes of

---

[7]Admin. Rec. at 21.

[8]Admin. Rec. at 22.

[9]Admin. Rec. at 22.

[10]Admin. Rec. at 22.

[11]Admin. Rec. at 23.

decompensation, which had been of extended duration.[12]  The ALJ also found that the "paragraph C" criteria were not satisfied.[13]

"Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC."  Bray v. Comm'r of Social Security Admin., 554 F.3d 1219, 1222–23 (9th Cir. 2009).  The ALJ found that plaintiff had

> the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant cannot climb ladders, ropes, or scaffolding; can have no exposure to unprotected heights; needs to avoid concentrated exposure to non-weather extreme cold and extreme heat; and needs to avoid concentrated exposure to excessive vibrations.  The claimant is also limited to working in places and situations where there would be no more than normal commercial/industrial lighting and in which he would not be around anyone who would be welding or causing any excessive flashing or bright lights.  Further, the claimant is limited to unskilled work that does not involve the use of detailed written instructions.[[14]]

The ALJ found plaintiff's symptom statements less than credible because they were inconsistent with the medical evidence, because plaintiff had not sought regular neurological treatment, because they were inconsistent with his daily activities, because they were inconsistent with statements from plaintiff's past employers, and because plaintiff called in

---

[12]Admin. Rec. at 23-24.

[13]Admin. Rec. at 24.

[14]Admin. Rec. at 24.

sick or left early only 5 or 6 times during the course of working full-time for nine months.[15]

The ALJ gave great weight to Dr. White's opinion.[16]  The ALJ gave little weight to Dr. Roberts' opinions.[17]  The ALJ gave partial weight to the opinions of Drs. Fraser and Russo.[18]  The ALJ gave little weight to Dr. Fuller's opinion[19] regarding plaintiff's ability to be exposed to noise but great weight to the rest of her opinion.[20]  The ALJ gave little weight[21] to Dr. Youngblood's opinion.[22]  The ALJ gave little weight to Dr. Jones' opinion[23] that plaintiff

_____

[15]Admin. Rec. at 26-29.

[16]Admin. Rec. at 30-31.  Dr. White's opinion is discussed below in detail.

[17]Admin. Rec. at 31.  Dr. Roberts' opinions are discussed below in detail.

[18]Admin. Rec. at 31-32.  Dr. Fraser's and Dr. Russo's opinions are discussed below in detail.

[19]Dr. Fuller testified as a medical expert at the administrative hearing.  Dr. Fuller testified that plaintiff could not work in a "bright environment where the lights are really bright or . . . where there are any major environmental things like extreme hot, extreme cold. . . .  Also [no] working at heights or on ladders[;]" but that he would have no other restrictions.  Admin. Rec. at 55-56.

[20]Admin. Rec. at 32.

[21]Admin. Rec. at 32.

[22]On January 12, 2015, Keith A. Youngblood, Psy.D., did a neuropsychological evaluation.  Dr. Youngblood "recommended that Mr. Cannon apply for Social Security disability to help ensure at least a subsistence income and medical coverage."  Admin. Rec. at 1002.

[23]On May 8, 2015, Laura Jones, Ph.D., opined that plaintiff had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.  Admin. Rec. at 115.  Dr. Jones also opined that plaintiff was not

(continued...)

requires clear and concise expectations and that plaintiff would do best in positions with limited public and co-worker contact but great weight to the rest of her opinion.[24] The ALJ gave great weight to Dr. Hill's opinion that plaintiff had no periods of decompensation for extended periods and his opinion that plaintiff "is able to understand, remember, and follow-through with simple one-to-two step instructions."[25] The ALJ gave little weight[26] to Dr.

[23](...continued)
significantly limited in his ability to remember locations and work-like procedures, understand/remember/carry out very short and simple directions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation; and was moderately limited in his ability to understand/remember/carry out detailed instructions, sustain an ordinary routine without special supervision, maintain attention and concentration for extended periods, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in work setting, and set realistic goals or make plans independently of others. Admin. Rec. at 119-120. Dr. Jones further opined that plaintiff would be able to "understand, remember and follow through with simple 1-2 step instructions[,]" "would require a supervisor to provide clear and concise expectations[,]" "would do best in positions with limited public and co-worker contact[,]" "may require extra time [to learn tasks], but once learned, he can adapt to changes in the regular work environment[,]" and "is capable of the basic mental demands of unskilled work." Admin. Rec. at 119-120.

[24]Admin. Rec. at 33-34.

[25]Admin. Rec. at 32-33. On March 24, 2015, David O. Hill, Ph.D., reviewed Dr. Jones' assessment and indicated that he agreed with Dr. Jones' assessment as to plaintiff's understanding and memory limitations and her assessment as to decompensation. Admin.
(continued...)

Cherry's opinion.[27]  The ALJ gave great weight[28] to Dr. Moore's opinion.[29]  The ALJ gave

some weight[30] to the lay testimony of plaintiff's sister,[31] plaintiff's mother,[32] Terria Clayton,[33]

---

[25](...continued)
Rec. at 1008, 1010.

[26]Admin. Rec. at 34.

[27]On October 14, 2015, Russell S. Cherry, PsyD, examined plaintiff.  Dr. Cherry "[r]ecommend[ed] re-application for social security and related services.  Without intensive supports, the patient is not capable of steadily maintaining full-time competitive employment, and his current employment is apparently supported to some degree, but he can do well with the right intensive supports."  Admin. Rec. at 1028.

[28]Admin. Rec. at 34.

[29]Margaret Moore, Ph.D., testified as a medical expert.  Dr. Moore testified that plaintiff had mild limitations as far as daily activities and social functioning; moderate to marked limitations as to concentration, persistence, or pace; and no episodes of decompensation.  Admin. Rec. at 68-70.  Dr. Moore also testified that plaintiff would "benefit from being able to . . . learn by watching what he's supposed to do, and practicing and doing it visually and with hands-on as opposed to, for example, reading a manual of instructions and then setting off to do what he was asked to do in the manual."  Admin. Rec. at 69.

[30]Admin. Rec. at 36.

[31]Juli Cannon, plaintiff's sister, provided an undated function report.  Admin. Rec. at 298-306.

[32]The ALJ considered statements made by plaintiff's mother at doctor's appointments, in plaintiff's medical history reports, and at the administrative hearing.  Admin. Rec. at 77, 93, 725, 987.

[33]Terria Clayton was plaintiff's rep payee through Hope Community Resources.  Admin. Rec. at 642.  She provided a detailed statement of plaintiff's functional abilities.  Admin. Rec. at 640-641.

and Angela Gray.[34]  The ALJ considered the testimony of plaintiff's former employers, Karl

Green and Greg Tyler, but did not assign any specific weight to their testimony.[35]

At step four, the ALJ found that plaintiff was "unable to perform any past relevant

work. . . ."[36]

At step five, the ALJ found that "there are jobs that exist in significant numbers in the

national economy that the claimant can perform" including work as a bagger/hand packer,

---

[34]Angela Gray was plaintiff's vocational rehabilitation counselor.  On August 2, 2016, she wrote:

> Per our discussion at the time of your case closure, February 2015, your medical records indicate that you would be unable to maintain employment until after you had started a regimen of preventative medications for your severe and debilitating migraines.  You are encouraged to reapply for DVR services after you and your doctor have agreed that the preventative medication use has stabilized your migraines and that you would be able to engage in work activities.

Admin. Rec. at 737.

[35]Admin. Rec. at 28 and 29.  Green reported that plaintiff had worked as a pipeline laborer for three months in 2013 and that he was laid off and not let go for performance related issues.  Admin. Rec. at 689.  Green reported that plaintiff "was able to do the work. He called in a few times, but nothing major."  Admin. Rec. at 689.  He reported that plaintiff had no problem understanding and following simple job instructions, that he was able to understand and follow more complex job duties, that he was able to maintain concentration and attention adequately to complete his assigned job duties, that he worked "a little slower than others, but got the job done," that he got along with coworkers and supervisors, and that he was always open to suggestions about how to do his job better.  Admin. Rec. at 689-690. Green indicated that he would rehire plaintiff.  Admin. Rec. at 690.  Tyler's testimony is discussed in detail below.

[36]Admin. Rec. at 36.

laundry worker, or horticultural worker.[37]

The ALJ thus concluded that plaintiff had "not been under a disability, as defined in the Social Security Act from November 28, 2013, through the date of this decision. . . ."[38]

Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner. . . ." The court "properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). "'To determine whether substantial evidence supports the ALJ's decision, [the court] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Id. (quoting Andrews, 53 F.3d at 1039). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision. Id. But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'" Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting

---

[37]Admin. Rec. at 37-38.

[38]Admin. Rec. at 38.

<u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999)).

<u>Discussion</u>

Plaintiff first argues that the ALJ erred in giving Dr. White's opinion great weight. Dr. White was plaintiff's primary care physician. On January 31, 2014, Dr. White "cleared" plaintiff "to return to work without restrictions."[39] The ALJ gave great weight to this opinion because "it is consistent with [th]e record as a whole showing that the claimant did not seek neurological treatment from the alleged onset date to late July 2014 . . . , thus indicating that he did not experience functional limitations to the extent he has alleged during this time period."[40] The ALJ also gave Dr. White's opinion great weight because he was plaintiff's primary care physician.[41]

Plaintiff argues that there are two problems with the ALJ assigning great weight to Dr. White's opinion. First, plaintiff argues that Dr. White's opinion is not supported by his treatment notes, since as the ALJ observed, plaintiff had not had significant treatment prior to July 2014. Second, plaintiff contends that the ALJ's attempt to explain plaintiff's lack of treatment fails. In a footnote, the ALJ noted that "[a]lthough there is indication that the claimant did not have health insurance coverage during at least part of the period at issue . . . , there is no explanation as to why he was not eligible for such coverage under the provisions

---

[39]Admin. Rec. at 988.

[40]Admin. Rec. at 30-31.

[41]Admin. Rec. at 31.

of the Affordable Care Act."[42]  Plaintiff contends that if the ALJ had questions as to his insurance coverage, the ALJ should have brought this issue up at the administrative hearing.

Contrary to plaintiff's argument, Dr. White's opinion was supported by his treatment notes.  Dr. White's notes indicate that while plaintiff had migraines, ranging from 1 or 2 a month to 2-4 per year, his headaches responded well to Imitrex and Phenergan.[43]

As for the ALJ's explanation that Dr. White's opinion was consistent with the fact that plaintiff did not seek treatment for his headaches from the alleged onset date in November 2013 until July 2014, the record does bear this out.  Plaintiff did not seek any treatment for his headaches during this time period.  But, plaintiff is correct that it is not clear from the record why he was not receiving treatment at that time.  If it was because he lacked insurance and could not afford treatment, that fact should not weigh against him.  See Trevizo v. Berryhill, 871 F.3d 664, 681 (9th Cir. 2017) (quoting Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995)) ("'Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds.'")  The ALJ questioned why plaintiff would not have had insurance under the Affordable Care Act, but the ALJ did not explore this issue.

But, that does not necessarily mean that the ALJ erred as to Dr. White's opinion.  As discussed above, Dr. White's opinion was supported by his treatment notes.  Thus, the ALJ

_____

[42]Admin. Rec. at 27.

[43]Admin. Rec. at 911, 922, 929, 932.

did not err in giving Dr. White's opinion great weight.

Plaintiff next argues that the ALJ should have further developed the record after Dr. Moore criticized Dr. Youngblood's and Dr. Cherry's testing methods. "The ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" Garcia v. Comm'r of Social Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003)). "The ALJ's duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect h[is] own interests." Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" Id. (quoting Smolen v. Chater, 80 F.3d at 1273, 1288 (9th Cir. 1996)). "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." Id.

Dr. Moore criticized Dr. Youngblood's assessments of borderline intellectual functioning and learning disabilities or disorders NOS.[44] She explained that Dr. Youngblood relied on "the WAIS-IV and the RADD" to reach his conclusions but that

> [t]he RADD is not an ideal assessment for learning problems. It's a screening tool. It kind of gives an overview of where the difficulties are, but overall . . . I thought that the learning disorders were, . . . as revealed by the RADD, . . . really consis-

---

[44]Admin. Rec. at 64.

tent with the claimant's baseline IQ, and so many folks would not even go to the actual level of saying there are learning disabilities.[45]

As for Dr. Cherry, Dr. Moore testified that his administration of the WAIS-IV was "out of the standard of acceptable testing practice" because he "leaves out some of the subtests."[46]

Dr. Moore also found fault with Dr. Cherry's evaluation because

> [t]here are test[s] reported as administered but results are not always provided in the report. I think that's the case here. He had documented on one report, he had some neurological notes and that sort of thing, but his own assessment tools are not always reported.[47]

Plaintiff argues that because Dr. Moore criticized the testing methods used by Dr. Youngblood and Dr. Cherry, the ALJ should have either asked Dr. Moore if further testing was needed to clarify their results or ordered new testing. Plaintiff argues that Dr. Moore opined that the evidence in the record was flawed and thus the ALJ had a duty to further develop the record.

Dr. Moore's testimony did not trigger the ALJ's duty to further develop the record. Dr. Moore's testimony did not create any ambiguities in the evidence. Rather, in criticizing Dr. Youngblood's and Dr. Cherry's testing methods, Dr. Moore was explaining why her opinion was different from theirs. Moreover, Dr. Moore testified that she had adequate

---

[45]Admin. Rec. at 65.

[46]Admin. Rec. at 66.

[47]Admin. Rec. at 66.

information on which to base her opinion. Dr. Moore testified that "I don't think I need to know anything more than what I already do"[48] and that she had "enough evidence to have an opinion as to the claimant's medical status[.]"[49] Dr. Moore also testified that the records from plaintiff's youth were not complete but that while such information would be "interesting and historical", it was not necessarily required to evaluate plaintiff in the "current timeframe."[50]

Plaintiff next argues that the ALJ's duty to further develop the record was triggered by Greg Tyler's testimony. Tyler was plaintiff's former employer at the Egan Convention Center. On August 4, 2016, Tyler wrote that plaintiff

> was hired on 7/22/15 and his last day of employment was 4/30/16. Eric's job title was conversion worker, his main duties w[ere] to setup stages and chairs for multiple events and tear down after events. It became clear early on to co-workers and management that Eric had problems remembering and performing his duties when given multiple tasks. We had to ask all of our employees and management to only assign Eric one task to perform at a time because of his disability. I work[ed] with Eric so he could make all of his appointments with his neurologist. Eric called off or left work 5 to 6 times during his employment with SMG because of se[vere] headaches.[51]

The ALJ considered Tyler's testimony and found that it indicated that plaintiff's migraines

---

[48]Admin. Rec. at 62.

[49]Admin. Rec. at 62.

[50]Admin. Rec. at 63-64.

[51]Admin. Rec. at 739.

> did not significantly interfere with his job perfor-
> mance. . . . Rather, although Mr. Tyler reported
> that it became clear early on to both co-workers
> and management that the claimant had problems
> with remembering and performing his duties when
> given multiple tasks, it was also reported that he
> was nevertheless able to maintain his employment
> in this position by being assigned only one task at
> a time . . . .[52]

The ALJ also noted that "[a]lthough it was indicated that the claimant called in sick from work or left work early approximately five or six times due to severe headaches, there is no indication that this was a problem for this employer such that the claimant was let go as a result."[53]

Plaintiff argues that the ALJ should have further developed the record as to Tyler's testimony because Tyler did not expressly explain why plaintiff no longer worked for him. Plaintiff also points out that Tyler indicated that he accommodated plaintiff's medical appointments and call outs and his limitations as to remembering instructions. Plaintiff argues that the ALJ should have explored with the vocational expert whether these were accommodations that all employers could reasonably be expected to provide or whether the need for such accommodations would have eroded the number of jobs available for someone with plaintiff's limitations. Plaintiff also seems to suggest that the ALJ should have clarified whether his work at the Egan Center was considered full time or part time.

---

[52]Admin. Rec. at 29.

[53]Admin. Rec. at 29.

Although Tyler did not indicate why plaintiff no longer worked at the Egan Center, plaintiff testified that he stopped work because Dr. Roberts "just told me, you know what, we're taking – we're just completely taking you off work until we get this [plaintiff's headaches] figured out."[54] This testimony is supported by Dr. Roberts' treatment notes from 2016, in which he advises plaintiff to stop working. There was nothing further for the ALJ to develop as to this issue.

As for whether plaintiff worked full time or part time, the record is clear that plaintiff worked essentially full time at the Egan Center. The ALJ indicated[55] that plaintiff had testified that he worked "nearly" full time, working 38 hours a week,[56] and other evidence indicated that "[a]lthough it is technically part-time," plaintiff was working 40 hours per week at the Egan Center.[57] There was nothing further for the ALJ to develop as to this issue.

As for the accommodations that were made by the Egan Center, Tyler stated that plaintiff was limited to one task at time. The ALJ limited plaintiff to unskilled work. The Social Security regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a). While some unskilled work might only require an employee to do only one task

---

[54]Admin. Rec. at 87.

[55]Admin. Rec. at 29.

[56]Admin. Rec. at 87.

[57]Admin. Rec. at 1018.

at a time, it is not clear that all unskilled work would encompass such a limitation. It is not clear what impact, if any, plaintiff's ability to only perform one task at a time would have on his ability to sustain full-time employment. The ALJ should have further developed the record as to this issue.

As to the call-out issue, Tyler stated that plaintiff called out 5-6 times in a nine-month period. The ALJ noted that there was no indication that this level of call outs was a problem for Tyler,[58] but that does not necessarily mean that it would not be a problem for other employers. The ALJ should have clarified with the vocational expert whether this number of call-outs on a regular basis would preclude full-time employment.

Plaintiff next argues that the ALJ erred in rejecting Dr. Roberts' opinions. On August 15, 2014, Dr. Roberts opined that

> "[a]t present, although very unusual for me to state for migraine, I believe that he is permanently (duration of at least 12 months) and totally disabled from any meaningful employment that could be available. This is my professional opinion. I do believe that with ongoing and aggressive care, that we may be able to modify his migraines in intensity, frequency and associated cognitive difficulties, so that he is productive again. Until then, his outlook for improvement and gainful employment is bleak.[59]

On May 4, 2016, Dr. Roberts

> reiterate[d] that I believe that the patient is permanently (duration of at least 12 months) and totally disabled from any meaningful employment that could be available. This is my professional

_____

[58]Admin. Rec. at 29.

[59]Admin. Rec. at 971.

opinion. This has proven to be true, with several attempts at work, despite my warning, and subsequent requirement of emergency services. . . . I do believe that with ongoing aggressive care, that we may be able to modify his migraine intensity, frequency and associated cognitive difficulties so that he is productive again. Until then, his outlook for improvement and gainful employment is bleak.[60]

On June 2, 2016, Dr. Roberts "reiterated that it is my medical opinion that this patient is permanently and totally disabled."[61]

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion," as Dr. Roberts' opinions are, "an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Trevizo, 871 F.3d at 675 (quoting Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008)). "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" Id. (quoting Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).

The ALJ rejected Dr. Roberts' opinions because they are "inconsistent with the fact that, at all of these appointments in which he opined that the claimant was disabled, the results of contemporaneous neurological examinations were largely normal. . . ."[62] The ALJ also rejected Dr. Roberts' opinions because they were "internally inconsistent with the fact

---

that he consistently noted that with appropriate treatment of a more consistent and aggressive nature, the claimant's migraines may be able to be modified such that he would be productive again. . . ."[63]  The ALJ also rejected Dr. Roberts' opinions because they were "inconsistent with the claimant's report" at his June and August 2016 appointments "that, overall, he was doing well on Topamax [and] had experienced a decreased frequency in his headaches. . . ."[64]  Finally, the ALJ rejected Dr. Roberts' opinions because they were "internally inconsistent with the fact that the claimant engaged in work activity at the level of substantial gainful activity at the end of 201[3] and on nearly a full-time basis for a several-month period from 2015 to 2016."[65]

Plaintiff only takes issue with the first reason given by the ALJ, which was that Dr. Roberts' opinion that plaintiff was unable to work was inconsistent with his normal neurological exams.  Plaintiff argues that given that the effects of migraines vary broadly from person to person, it was not unreasonable for Dr. Roberts to opine that plaintiff was not able to work even though there were no positive exam findings.  Plaintiff suggests that the ALJ should have contacted Dr. Roberts or ordered a consultative examination to determine what impact his headaches were having on his ability to work.

The ALJ was not required to contact Dr. Roberts or order a consultative exam.  An

---

[63]Admin. Rec. at 31.

[64]Admin. Rec. at 31.

[65]Admin. Rec. at 31.

ALJ may properly reject a medical opinion if it is not supported by clinical findings. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). The ALJ did not err as to Dr. Roberts' opinions.

Plaintiff next argues that the ALJ erred as to Dr. Fraser's and Dr. Russo's opinions. On February 3, 2015, Shirley Fraser, M.D., opined that plaintiff could occasionally lift/carry 50 pounds, could frequently lift/carry 25 pounds, could stand/walk for 6 hours, could sit for 6 hours, was unlimited as to pushing/pulling, was unlimited as to reaching and handling, had limitations as to fingering, and should avoid concentrated exposure to extreme cold, extreme heat, noise, vibration, fumes, odors, dusts, gases, and poor ventilation.[66] Dr. Fraser also opined that if plaintiff "were to find a job, it would have to be very supervised and not demanding."[67] On March 25, 2015, Libbie Russo, M.D., indicated that she agreed with Dr. Fraser's assessment.[68]

The ALJ only gave some weight to Dr. Fraser's and Dr. Russo's opinions that plaintiff should avoid concentrated exposure to noise because "there is limited evidence to support a finding that [plaintiff] has significantly limited functioning in the presence of noise or pulmonary irritants. For example, music has been described as an 'obsessive interest' of the

---

[66]Admin. Rec. at 117-118.

[67]Admin. Rec. at 118.

[68]Admin. Rec. at 1012.

claimant. . . ."[69]

"The Commissioner may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." <u>Sousa v. Callahan</u>, 143 F.3d 1240, 1244 (9th Cir. 1998). Plaintiff takes issue with the ALJ's rejection of the noise portion of Dr. Fraser's and Dr. Russo's opinions because he contends that an appreciation for music is not the same thing as consistent workday exposure to noise, such as factory noise.

While plaintiff may be correct that an appreciation for music is not the same thing as exposure to noise in the workplace, the ALJ rejected Dr. Russo's and Dr. Fraser's opinions about noise because there was limited evidence that this was a problem for plaintiff. This finding is supported by the record. The only evidence that noise was an issue for plaintiff is in a recommendation from Dr. Cherry. Dr. Cherry wrote that plaintiff "has a history of severe migraines that precluded his employment as a construction worker, as they are triggered by loud noise, which warrants consideration for any future programming for this patient."[70] Because this was the only evidence that plaintiff had an issue with noise, the ALJ did not err as to Dr. Russo's and Dr. Fraser's noise opinions.

Plaintiff next argues that the ALJ's RFC is flawed because it does not adequately account for the ALJ's finding that plaintiff had moderate-to-marked limitations as to

---

[69]Admin. Rec. at 32. The ALJ also believed that Dr. Fuller had "opined that the claimant needs to avoid a very noisy environment. . . ." Admin. Rec. at 32. But nowhere in her testimony did Dr. Fuller expressly opine that plaintiff should avoid noise in the workplace.

[70]Admin. Rec. at 1029.

maintaining concentration, persistence, or pace.  At step two, the ALJ found that plaintiff had

moderate-to-marked difficulties with regard to concentration, persistence, or pace.[71] The ALJ

then limited plaintiff to "unskilled work. . . ."[72]  This court has held that a limitation to simple

work "does not adequately address moderate limitations as to concentration, persistence, or

pace." Jahnsen v. Berryhill, 265 F. Supp. 3d 992, 999 (D. Alaska 2017).  Plaintiff argues that

the same is true of a limitation to "unskilled" work.

Defendant argues that the ALJ's RFC adequately addressed plaintiff's moderate-to-

marked limitation as to concentration, persistence, or pace.  Defendant contends that Dr.

Moore explained the nature and extent of this limitation.  The ALJ asked Dr. Moore if there

was "anything specific in the concentration, persistence, pace where you find more limitations

than not?"[73]  In response, she answered that plaintiff would "benefit from being able to . . .

learn by watching what he's supposed to do, and practicing and doing it visually and with

hands-on as opposed to, for example, reading a manual of instructions and then setting off to

do what he was asked to do in the manual."[74]  Defendant argues that the ALJ then accounted

for plaintiff's moderate-to-marked limitation as to concentration, persistence, or pace, as

defined by Dr. Moore, by limiting plaintiff to "unskilled work that does not involve the use

───────────────────

[71]Admin. Rec. at 23-24.

[72]Admin. Rec. at 24.

[73]Admin. Rec. at 69.

[74]Admin. Rec. at 69.

of detailed written instructions."[75]

While "simple" work and "unskilled" work are not the same, there is the same problem here as there was in Jahnsen, namely that the ALJ failed to adequately account in plaintiff's RFC for a moderate-to-marked limitation as to concentration, persistence, or pace. Dr. Moore did indeed testify that plaintiff would do better if he could learn tasks by doing, but that has little to do with his ability to concentrate on a task, persist at a task, or maintain pace while working. Dr. Moore's testimony related to how plaintiff would best learn a task, not whether plaintiff could stay on task for an 8-hour work day. Limiting plaintiff to unskilled work does not capture the essence of a moderate-to-marked limitation as to concentration, persistence, or pace. Thus, the ALJ's RFC is flawed.

Finally, plaintiff argues that the ALJ erred at step five. At step five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform" including work as a bagger/hand packer, laundry worker, or horticultural worker.[76] All of these jobs require level 2 reasoning. "Level 2 requires an ability to 'carry out detailed but uninvolved written or oral instructions[,]' and to '[d]eal with problems involving a few concrete variables in or from standardized situations.'" Mejia v. Colvin, Case No. CV 15-00600-RAO, 2015 WL 6513650, at *3 (C.D. Cal. Oct. 28, 2015) (quoting DOT, App. C, § III). The ALJ found that plaintiff had the residual capacity to perform "unskilled work that

_____

[75]Admin. Rec. at 24.

[76]Admin. Rec. at 37-38.

does not involve the use of detailed written instructions."[77] Plaintiff argues that this precludes work that requires level 2 reasoning. Plaintiff argues that if he cannot perform work that involves the use of detailed written instructions, he would be precluded from doing any level 2 reasoning work.

Because level 2 reasoning requires the ability to carry out detailed written <u>or</u> oral instructions, it may have been sufficient that plaintiff could only carry out oral instructions. But because this matter must be remanded for further proceedings because of ALJ erred as to Tyler's testimony and plaintiff's RFC, this is an issue the ALJ should further develop on remand.

Conclusion

The final decision of the Commissioner is reversed and this matter is remanded for further proceedings.

DATED at Anchorage, Alaska, this 31st day of December, 2018.

/s/ H. Russel Holland
United States District Judge

---

[77]Admin. Rec. at 25.